Okay, we'll hear the second case, Appeal Number 17-2247, Sprint Communications Company v. Time Warner Cable. Mr. O'Quinn, whenever you're ready. Thank you, Judge Chen, and may it please the Court, John O'Quinn on behalf of Time Warner Cable. I'm happy to address any questions the panel may have this morning on any of the issues, but I intend to focus on two, the improper admission and use of the Vonage verdict and the finding on written description. Starting with the Vonage verdict, there are a number of reasons that it should not have been admitted and should not have been used in this case, any one of which requires vacating at least the damages award, and I would submit the entire verdict. But let me start with the most obvious problem. The Vonage verdict is evidence relying on the 25% rule of thumb, which this Court held was categorically inadmissible in Unilock. And so the question before you then is whether it is permissible for a second jury to be exposed to and indeed invited to follow an earlier jury's verdict on damages when that verdict is admittedly infected by legal error. Let me ask you this question. Since we're talking principally about the role of the Vonage verdict in the hypothetical negotiation, that's the way the parties characterize the Vonage verdict in this case, as I understand it. The Vonage verdict, excuse me, the hypothetical negotiation would have taken place no later than 2010. You contend earlier, but certainly it was no later than 2010. The Unilock case was not decided until 2011. Why isn't it a perfectly permissible use of the Vonage verdict to look at that verdict, which was not as of that time invalid because of a later decision in Unilock, just as a data point that the parties would have been aware of? Sure. So Judge Bryson, first, a couple of points. You're right that at that point in time Unilock had not been decided. But imagine this case, the Vonage case had actually gone up on appeal, had been Unilock. The argument would be, oh, well, you have the jury verdict that gets decided and can be considered at the time of the hypothetical negotiation, but it subsequently then gets reversed on appeal. Are you saying that they could, are they saying that they could then rely on that verdict in those situations? This Court has... I think not. But the question is, if all you look at is the Vonage verdict, you say, okay, the parties would have been aware of a number of circumstances. They would have been aware of the Paytech license, they would have been aware of the VoiceGlo license, and they would have been aware of this verdict, which was not something that they could have looked at and say, we can disregard that because it's obviously invalid under the Unilock case. The Unilock didn't exist, so they would at best have had a supposition that they might have been able, that somebody might have been able to get that verdict overturned. But why wouldn't that be at least a fact, the existence of that verdict that could be taken into account in the hypothetical negotiation? So, Judge Bryson, a couple of points. First, the hypothetical negotiation, of course, is a legal construct. I mean, Pandewitt calls it a, quote, legal fiction, 575F2.1159. And it relies on information that parties could not have known in the real world, like licenses between other companies, and it excludes information that parties would have known in the real world. So, for example, not all comparable licenses are admitted. Settlements are kept out if they're too influenced by the coercive effects of litigation. And here, what you're talking about is a verdict that ultimately is a matter of law, whether it would have been known at the time or not, wrong. And whenever a jury is exposed to a prior jury's verdict, there is a tremendous risk that the second jury is going to follow it. That is exactly the concerns of the third, the fifth, the ninth, the D.C. circuits in cases like Coleman and the kind of improper influence that this court has warned about in its precedence. And so there's a reason that courts, most courts, as Inguist put it, do not permit this kind of use of a verdict or any kind of use of a verdict at all. But when I think the first one is now, with the benefit of hindsight, unquestionably infected by legal error. Well, suppose, just to complete this thought, suppose that, you know, it had not yet been decided and, in fact, wasn't even decided as of this day. Do you think you would be which we think is invalid? And we think you, in deciding whether the Vonage verdict should be used, ought to take into account that it was infected by a rule which you should now override? Sure. So, Judge Bryson, that would obviously present us with additional hurdles. Here, you clearly have a verdict that is admittedly infected by legal error. And it wasn't offered for some ancillary purpose. It's not like the verdict came in to be used to test somebody's ancillary purpose. It was offered precisely for damages, the very issue on which the error occurred. And the jury comes back and awards the same per-subscriber royalty of $1.37. I mean, respectfully, this is a wolf in wolf's clothing. There is too much risk that the second jury is just going to simply follow the first. I guess, isn't it right that the jury was informed that this wolf was, in fact, a wolf? They knew that the Vonage verdict was premised, at least in part, on this problematic 25 percent rule. And so, therefore, they should take that into account in trying to figure out how much meaning they should accord to it. Is that fair to say? Well, Judge Chin, not by the court. I mean, it's true that the parties essentially had a mini-trial in front of the jury about what was wrong in the Vonage verdict itself. And that puts, again, this goes to why I think, as a general proposition, these types of verdicts should never be admitted in order to prove damages or otherwise, because I now have to convince this jury, the jury I'm in front of, that the prior jury was wrong. I mean, that creates serious due process issues, as this court has referenced in cases like Mendenhall. And I think it's all the worse where the second jury here was specifically invited, instructed that it could consider the first jury's damages award. And in this case, the Vonage verdict ultimately, of course, serves as a road map for the jury. It ultimately decides the same issues the same way on infringement, validity, and damages. And if you think it's OK in this case, well, get ready, because you're going to see verdicts coming in, in case after case after case, where there are going to be mini-trials, where plaintiffs will bring in the damages verdicts that they like from one jurisdiction, defendants will bring in the verdicts they like from another jurisdiction. And that's never happened. Verdicts have been around  I don't want to say it's never happened. What do you say to the Applied Medical Resources case in which the court, as I read the court's decision, said that the prior verdict could be used for purposes, among others, of the hypothetical negotiation? Sure. So, Judge Bryson... Can you distinguish that case on the ground, that it was the same party in the first case? But I'm not sure I see why that's a persuasive distinction. I think there are multiple differences in that case. First, that didn't involve a verdict, as far as I'm aware, that was infected with legal error. Well, OK. Set the 25% argument aside. You're arguing now for a per se rule, don't let verdicts in. And I'm wondering why that per se rule isn't inconsistent with Applied Medical Resources. Right. And what I would say, Judge Bryson, is that, first of all, this didn't involve the use of a prior jury's damages number. It was about whether or not the prior jury's ruling on willfulness was then, was itself... And there were two issues in Applied. Willfulness was one of them, and hypothetical negotiation, i.e. damages, was the other. And I looked at the briefs in that case, and they were absolutely arguing in favor of damages as well as willfulness. Sure. So the finding of willfulness was relevant to damages. That was the argument being made in that case. But both parties were in agreement... Hypothetical negotiation was a separate argument for willfulness, as I read the record in that case. And the other point, Judge Bryson, both sides were actually arguing that it was relevant there. So I don't think that you had the same issue that was presented here. Let me, in the time that I have, let me make one other point with respect to the Vonage verdict as it relates to the issue of apportionment. Because whatever you think of the Vonage verdict and whether it should be admissible because it's infected with error, or whether it should be admissible at all because of the threat of improper influence on the second jury, Sprint's use of the Vonage verdict raises fundamental apportionment issues as well. Nothing about reliance on that verdict is consistent with apportionment principles. Dr. Rao doesn't try to apportion either the rate or the base from Vonage when converting to a per subscriber dollar figure. He instead uses the entire value of VoIP. And indeed, none of Dr. Rao's methodologies assign value to those aspects of VoIP that are not covered by the claims. There's no carve out for IP to IP calls that don't interconnect with PSTN. And in fact, there was testimony of the trial transcript, page 2535, but the majority of TWC's calls, by the end of the damages period, didn't involve interconnecting with the PSTN. Is it fair to say, you know, if you need a little more time, we'll give you a little bit more time. Thank you, Judge Schindel. But is it fair to say that the two licenses, Judge Bryson referred to them already, PayTech and VoiceGlo, those were 5% rates based on end-to-end VoIP service. Is that right? Judge Schindel, yes. Those were settlement licenses. So those rates for those two licenses are consistent with the rate, or I guess monthly subscription rate that was being proposed off of the Vonage verdict. Is that fair to say that we have three, could it be fair to say that there were three data points here and they all lead to the same conclusion, 5%? I don't think so, Judge Schindel. Why is that? Well, the reason is because Sprint specifically disclaimed offering an opinion on a 5% royalty. You can see that in Appendix 4001. And it's not like there was ever the identification of a properly apportioned base for a jury to then apply a 5% rate to. And it certainly wouldn't result in the $1.37 figure that Sprint relied on in opening and in closing. Am I misremembering Erickson and C? Cicero. Cicero. Ciro, I think. Ciro. Let's go with Ciro. Where in both those cases, there were licenses that were being admitted with rates based on the entire product or the entire service. Oh, and Judge Schindel, Erickson, it makes explicitly clear that when that is taking place, that you have to engage in apportionment. That the expert, for that to be admissible, the expert has to then engage in apportionment to explain how it is apportioned away, the non-infringing technology or the technology that does not use the patents. If we accept that the Paytech and VoiceGlo licenses are comparable licenses, then why wouldn't that be evidence that, in fact, those willing parties who negotiated to those licenses did build in apportionment in reaching the 5% number on the entire VOIP and end service? Well, Judge Schindel, that would then get into, well, what's the difference between what their services were and what fraction of their services used the interconnection? I mean, again, these patents are about the interconnection, which actually then leads to the written description points that I'd like to address. They're not about VOIP. They didn't invent VOIP, and yet they are taking a slice of the entire value of VOIP, which this Court in Finjen and in Power Integrations most recently has made clear is exactly what you cannot do. And here, of course, the jury isn't given an apportioned base on which to apply that 5%. And even if a license is admissible, there's still the question of what is the base in the particular case. And as this Court recently reiterated, you generally need a determination of the royalty base in Power Integrations. Undertaking apportionment analysis where reasonable royalties are sought generally requires the determination of a royalty base that's properly apportioned. But I understand apportionment of the kind of apportionment that you're talking about as it applies to multi-component devices. That makes all sorts of sense. But I'm not sure how you would do the kind of apportionment you seem to be asking for in a case such as this. Can you outline how you would go about formulating an apportionment approach? Sure. Judge Bryson, I think that in cases like Erickson and Exmark have made clear that the essential requirement is that the ultimate reasonable royalty be based on the incremental value of the patent and invention. You look, what is the footprint of the invention itself? And it can't be that simply because it is a blocking patent or that it is a toll on the entire value of VoIP that they get to take from a slice of the entire value of VoIP without apportioning out the standard or the non-patented features of which they are legion in this case. Well, that's fine to say, but then mechanically it's difficult for me to see how you can do that if all you've got, for example, as a way that others have approached this is a 5% of the entire VoIP, which presumably the parties thought was fairly attributable to the contribution of the patents in VoiceGlo and Paytech. Yeah, and Judge Bryson, part of the problem with the reliance on Paytech and VoiceGlo and part of the reason that the district court said that Dr. Rao could not say that they supported the use of the $1.37 figure is you don't know what the basis on which they would apply and what kind of actual dollar values that you are talking about. At the end of the day, whatever you think of the Paytech and the VoiceGlo licenses, there's no dispute that the numbers that were put in front of the jury were numbers that were based on the Vonage verdict. And indeed, if you look at opening and in closing, it was very clear at Appendix 31, 55, 58, 97 that they were relying on the Vonage verdict. I realize that I'm well into my time. If I'd like to turn and address the issue of written description, Judge. Take a minute of that and then we'll give you some rebuttal. Thank you. I appreciate it. So the key facts, the important point on written description is the key facts are undisputed. The question that remains is what is the legal significance of them? And first, with respect to the call control patents, it is undisputed that the only embodiments are ATM and ATM, like the public switch telephone network, requires setting up a communications path. This is undisputed. IP does not. That's undisputed and the reason this is significant. The reason this is significant is because the specification only discloses methods and systems for interconnecting by setting up a communications path between points. The very thing that ATM needs and that IP does not. And so the problem being solved is a better way of doing that. Meanwhile, the claims, however, cover systems and methods where no path needs to set up and instead only a destination is identified. And identifying a destination like Chicago is not the same as setting up a path to get there as in designating the roads. Now, with respect to the so-called broadband patents, which this court previously referred to as the ATM interworking patents in the Cox Appeal, they do not disclose and there is not evidence that a skilled artisan would understand using an ATM interworking multiplexer that translates to or from something other than ATM. I mean, after all, it is an ATM interworking multiplexer and the specification, no surprise, only discloses an ATM interworking multiplexer that translates to or from ATM. That's what it means to be an ATM interworking multiplexer. The idea of one that doesn't convert to that but instead converts to or from IP is frankly nonsense. Now, that may be an enablement problem, but it is also a possession problem because it's nowhere disclosed in the specification. Okay, got it. Thank you. Thank you, Judge Chen. Could we reset Mr. Jakes' time to 18 minutes? Good morning. May it please the court. This was a fair trial. The judge very carefully cabined the Vonage verdict with three limiting instructions at Time Warner's request. It did not infect the entire trial and really the idea that this was all about Vonage is not true. Can you answer a question that I've had throughout this? It just seems to me almost bizarre that we have the Vonage verdict playing such a central role because instead of simply taking the 5% number, we go through Vonage's revenues and come out with a 137 per subscriber per month number. Why didn't we simply say, and it may be because the district court forbid it, but why didn't we simply say that number was 5% and the other two licensors were 5% and therefore no need to go into the per subscriber basis? I think you were around $36 to $39 per subscriber total profit. 5% of that would have been more than $1.37. I'm not sure why we ended up in this very strange circular maneuver. First, I'd say the Vonage verdict is not as central as it was made out to be. If you look at Dr. Rowe's testimony on direct, it goes over about three or four pages and it's bookended by the VoiceClo and Paytech agreements. So I don't believe that characterizing that as the entire basis is fair. But the 137 comes directly from Vonage. It does. And the reason was, Your Honor, is that Sprint was trying to translate this amount into something that had previously been the basis of the party's relationship, which was a per subscriber per month cost. Now, Sprint was also trying to avoid putting up entire revenue numbers and running into problems of Unilock. So they carefully tailored it to the $1.37 rather than saying 5% of a billion dollars. So that was also deliberate as well to make it focused on the per subscriber per month royalty. Now, the Vonage verdict was used to translate that 5%, but there's no doubt that 5% was a reliable number. These were comparable agreements. There's no per se rule against jury verdicts. And in fact, even Time Warner's experts said that verdict would have been in the mix. And based on that, I'm not sure how- And it makes in the sense of being part of what the parties would have considered an hypothetical negotiation. Exactly. It was- Does the focus on the monthly subscription number, which was $1.37, somehow undercut the reliance of the two licenses and their 5% numbers? Because now we're no longer talking about a rate on a particular base, but now we're talking about these monthly subscription numbers for each customer. And so now maybe it's a little bit of an apples and oranges situation in terms of trying to understand to what extent the jury was really looking to and relying on those pay tech and voice glow licenses. Well, we can't really speculate about what the jury did. But what we do know is both of those were at 5% of the voice over IP revenue. Well, obviously, I have to be a little bit concerned as to whether this jury simply blindly deferred to and adopted the Vonage verdict as opposed to seeing it as just a data point in a compilation of data points and weighed all the evidence and then came to a conclusion that just happened to be to the hundredth decimal point the exact same verdict as the Vonage jury. Yes. At the low end of what Sprint said they could award. Sprint also presented other numbers, including the expected profit- No, but the jury picked the Vonage number. They did. That actually tended to push the number down in the hypothetical negotiation. Because if you looked at apportioning the expected profits, the actual profits, it would have been something more like $12. Or if you take the actual negotiation for services, it could have been between $184 and $4. There was a whole series of these apportionments that Dr. Rao did. And the 5%, in some ways, favored Time Warner. I have to say, I find the idea of relatively even free use of prior verdicts to be troubling. You obviously wouldn't allow, say, eight experts to get together, prepare a report, and then submit that report without cross-examination or anything else to the jury and say, well, these eight experts came up with $1.37. Who are you to disagree? Why is that fundamentally different from introducing the verdict of eight lay people at the end of a trial? Well, first of all, you presume the jury was correctly instructed. Let's assume that the experts were all correctly instructed. The point is that this is extraneous evidence powerful to a jury. A former jury, prior to your having arrived here, came up with $1.37. Why shouldn't you? Now, they didn't make that argument in those words, but doesn't that argument loom large in this setting? I don't believe it does because of the instructions that the jury was given. The court was very careful to say, this is one factor that you may consider on damages. It's not something that you have to defer to. The argument that the jury was supposed to defer to this, that was never made. It was very carefully limited on validity and infringement, and so that did not infect the overall trial. It was a fair trial. About your concern that just generally allowing jury verdicts, I think that's overstated. I don't think there are going to be that many circumstances where a prior jury verdict is as comparable as this one. Here we have the Vonage case. Time Warner was acutely aware of it. They had somebody monitor it. They didn't have somebody in the courtroom because they didn't want to be discovered. They knew about it. During the actual negotiations, Sprint brought up the Vonage verdict. Why wouldn't they? That's what normally happens. They say, look, here's what we got in this prior case. That goes into the hypothetical negotiation. It was actually discussed between the parties when they were saying, look, we got this Vonage verdict. Should that be the rule, just because the defendant knows about the jury verdict, and they, in fact, had some references to the jury verdict, therefore it's admissible as evidence? No, but what we're looking at- But what would be the rule? I also shared Judge Bryson's concern that we just can't, in a freewheeling way, admit jury verdicts left and right. There has to be some kind of limiting principle. And what is that limiting principle? It should be the same as when we look at either settlement agreements or prior license agreements. Is it comparable? And would it be something that would be considered at the hypothetical negotiation? And the answer to both of those is yes, because it is comparable. It concerns the same patents, the same patent portfolio. It was something that the parties knew about. And as Time Warner's expert said, it would have been in the mix at the hypothetical negotiation. So yes, it is relevant for that purpose. Is it dispositive? No. Is Paytech or Boyce School dispositive? No. They are things for the jury to consider. You know, if the limiting instruction had been, you may consider this prior verdict only for purposes of determining what effect it would have had on the parties in the course of the hypothetical negotiation, it seems to me your argument would be stronger. Because the court instead said damages, which means it could be used for any damage-related issues, including this is what was given before. Why shouldn't we give the same amount again? I think the instruction was a little more careful than that. Although I understand, Your Honor, it wasn't to that extreme. But the judge said this is something you may consider, not you must consider. It was among the factors. There was a complete instruction on the things that need to be considered. Was there any request for a more restrictive instruction? The judge said that he would give a limiting instruction no matter what, whatever Time Warner proposed. And there was no proposal for a more restrictive instruction along the lines of what I'm... I'm not aware of that. They did try to move to exclude it. Yeah, I understand that. But the judge said he'd given a limiting instruction. Yeah, okay. Now, the question of reliability of the verdict, I think, is established by the other two agreements. And as I said, they were bookends. It's not like Dr. Rouse started with the Vonage verdict. He actually started with a voice bill agreement. And he said these are all consistent. As for apportionment, well, they're comparable agreements. So we can assume that the parties in negotiating them, or the jury in the Vonage case, did some apportionment down to 5%. As we know from like the Exmark case and others, there are different ways to do apportionment. And when you have a comparable agreement that would be part of the hypothetical negotiation, that may be what you need to do for apportionment. Dr. Rouse did more apportionment than that. And the judge said, look, he did apportionment in his analysis. He looked at the expected profits, the actual profits, and he did take away those things that were not attributable to the invention. He took away the typical telephone service. That wasn't part of the cost. Yeah, that was all part of his calculation, which went down from 38 or 39 down to 12. But that never found its way into, as I understand it, the $1.37. As I understand it, the $1.37 was just predicated on an all VOIP. That's right. Loyalty base. So that just all seems to me to be window dressing. No, I don't think so. What effect did his reduction to $12 have on the ultimate determination as to damages? Well, first of all, we don't know what the jury did, but we know what Dr. Rouse did. Logically, what effect did it have? It just seems to me to be sort of a collateral matter that had no effect on the calculation of the $1.37. I think if you read the testimony, it's not collateral. There was another witness who testified extensively on the profit analysis. And then Dr. Rouse did three things. He put on a chart, here are the three things to look at. Comparable, actual profits, expected profits. And he went through each of those. And he said, if you do the comparables, you end up at $1.37. If you do the expected or actual profits, you end up with a larger number. And then he looked at the last best offer and how much Sprint stood to lose in profits compared to... Now, I understand all that. What I'm focusing in on is his pulling out the regular phone service and other items, getting from $36 or $39 down to $12, whatever it was. And that seemed to me not to bear any relationship to the $1.37. Well, it's more. That's the relationship. Well, $12 is more. But if you take, for example, 5% of the $12, you're down to $0.65 or $0.60. So it's just not... Well, the 5% was not of profits. That was not what was established in the comparables. It was the 5% of revenue attributable to connecting a voice over IP. Right. And that's where the failure, the quote, failure to apportion argument comes from. When Dr. Rao apportioned the profits, it actually turned out to be more than that. So as I said, that was Time Warner's benefit. This was the lowest number. And the jury actually awarded the lowest that Sprint said. Dr. Rao was asked, he said, could it be more? And he said, yes, it could. And these were all given as alternatives. Now, I don't think the 25% rule also tainted things to the degree that Time Warner says. There was a case that followed Unilock where one of the experts testified about the 25% rule. But there were other things supporting that verdict. And that was allowed. I think that's the energy transportation case. We have that similar thing here, both in the Vonage case. And in this case, there's additional evidence supporting the jury verdict. In the Vonage case, the expert actually testified as to a 7% royalty. And the jury awarded less. Isn't that true of the facts of Unilock, though, too? It is. The plaintiff relied on the 25% rule of thumb and then proposed a certain rate. And then the jury came in under that plaintiff proposed rate. And then this court, nevertheless, said this all started from a tainted place. So despite the fact that the jury didn't adopt what the plaintiff wanted, it's still not good enough. And we have to start over. So that could potentially happen here, too, because of the reliance in the Vonage verdict on the 25%. You're right. It could have. It did not. And as Judge Bryson observed, the hypothetical negotiation took place before Unilock was decided. This case, this case between Sprint and Time Warner, there was extensive discussion of the 25% rule. Dr. Rao was cross-examined for quite a long time about it. Time Warner's expert said Dr. Rao did not use the 25% rule. His testimony was not tainted. But he used the Vonage verdict, which did use the 25% rule. So in that sense, his expert report is premised on the 25% rule. It's not. I don't agree with that. It's premised on three comparable data points that all said 5%. And one of those, there was evidence of the 25% rule introduced in the case. But that was not what was actually awarded. So I don't agree with that. It was premised on it. Could you make sure and save some time to talk about the written description, particularly with respect to the broadband patent? Sure. And before you do, just a real quick question. If, for reasons of written description or doctrine of equivalence, we should find that the broadband claims do not survive, does that make any difference to the judgment in this case? The short answer is no. OK. Now, if you could talk to us about the written description, broadband especially. This is a fact. Could you answer a little more? Sure. You've convincingly said no, it wouldn't have. But I would love to hear a because. Why did it not have any impact on the damages? Because there was a single verdict and a single number that was answered by the jury. Dr. Rao testified that if you infringe one, well, our technical expert, Dr. Wicker said, there's infringement of any one of these claims when there's an outbound call to the PSTN or an inbound call to the PSTN. Time Warner did not propose a verdict form that would have separated these out patent by patent. They proposed a lump sum. They didn't object to the verdict form. It's too late now to go back and try to parse that out, especially since there's testimony supporting the fact that if any of these patents were infringed, it would be the same royal. Is that the standard? If there's a conceivable way of reading the jury's verdict as granting all these damages just based on infringement of any one patent claim, that's good enough to preserve the damages verdict? As opposed to asking the question a little differently, which would be, is there any possible way that the jury needed to rely on those broadband patents in order to reach the $139.8 million, Judge? I think it's the first. Right, but why? Because that was not the way the case was presented. If the case had been presented that these are separate, that you need to award damages separately, then we would have a basis for going back and unparsing what the jury did. Now, given the way things are now, I think it's fair that the assumption is in Sprint's that the jury found all the claims infringed as they did on the verdict form, and that is not challenged on appeal, except for the doctrine of equivalent. Could you go to the broadband patents? Sure. And I'm also a tad confused about using an ATM interworking multiplexer in the context of an otherwise IP-based network. Yes. How is it that the inventor here, Dr. Christie, showed the world that he contemplated something like that in his specification? First of all, I'd say that it's a factual issue. This was testified to at length for hours between the two technical experts, and they both presented their views on that, that a person of ordinary skill in the art would read this specification in the way that Sprint says, and read it broadly enough that it could cover IP. But even if I were to agree that, okay, at that time of the invention, there were ATM-based networks, and then there were IP-based packet switching networks, but what is the evidence to give us any comfort that you could be mixing and matching elements from the two asynchronous communication networks into creating, I don't know, a Frankenstein asynchronous communication network? Actually, the evidence is that ATM and IP were compatible at the time. And if you actually look at the media gateway, it operated both. It was basically an ATM multiplexer, but you could modify it by switching the cards so that it could talk to IP on either side. So this is not something that was unheard of. This is something that actually existed. It's something that Time Warner used in their network. And the experts testified about that, that these things are not, they're not apples and oranges, that you're either all IP or all ATM. The device itself had an ATM backplane and used ATM internally as a way to communicate, but on the outsides it used IP. So it's not really that unusual. And it comes down to a technical question of the experts that was addressed at length. Okay. We're out of time. Thank you, Mr. Jenks. Can we give Mr. O'Quinn four minutes, please? Thank you, Judge Chen. So starting where we just ended, of course, the written description inquiry is an object of inquiry into what the specification would disclose to a person of ordinary skill in the art. And there is nothing in the specification of either the broadband patents, the ATM interworking patents, or the call control patents that shows that you can mix and match between an ATM and IP. And indeed an IP interworking multiplexer, which is what you would have if you switch out the cards, is not translating to or from ATM. And there is nothing in the broadband patents that suggests having an ATM interworking multiplexer translating to or from something other than ATM because it doesn't exist. It doesn't make sense. So it is something that they didn't possess. And there was a reference made to some kind of a backplane argument about ATM. That was rejected by the jury. They found that there was no literal infringement of the broadband patents. I think that the call control patents fail for very similar reasons, for reasons that this court articulated in Lizard Tech and in Rivera versus ITC. You have, the question is, would a person of ordinary skill in the art take away from the call control patents an understanding that you could accomplish interconnecting other than by establishing a communications path between the points? That is an attribute of ATM. It is not an attribute of IP. And a person of ordinary skill in the art, there's no evidence, none, to suggest a person of ordinary skill in the art would understand that you could interconnect simply by identifying a destination. And that is how they proved infringement at trial, appendix 3642 to 45. The network code was just the IP address. So the broadband patents should all, and the call control patents should be found invalid. If the court were to find that the broadband patents are invalid, but that the call control patents would survive, of course, under Verizon, the general rule is that the verdict would have to be vacated and remanded. And to the extent that the argument he's making is, well, the way this was presented was these two entirely different set of patents had the same incremental value, had the same value, no matter how you approach them. Well, that just shows the intellectual bankruptcy of their position vis-a-vis apportionment. It shows that there is no apportionment to the incremental value of either set of the patents if you could return the exact same dollar figure for either one. Now, that actually leads back into some of the other questions. I mean, Judge Bryson, you're absolutely right. None of this faux apportionment that was done with respect to other numbers that were thrown around in order to skew the damages horizon, and they literally did it. Look at appendix 2358. So they could argue in closing, we're not greedy, we're asking for the smallest amount. None of those numbers fed into the $1.37 figure. And why is it that they went through all these hoops to come up with the $1.37 figure as opposed to just using 5%? Because they knew they would run headlong into problems under the entire market value rule because the base that they were going to use is unapportioned VOIP revenue. And that is exactly what you cannot do. You cannot use unapportioned VOIP revenue because that, again, doesn't reflect the incremental value of the invention. Now, turning back to the issue of the jury verdicts, of course, the premise of a hypothetical negotiation is about voluntary agreements. Voluntary agreements show how the market values something. As Judge Andrews, I think, persuasively explained in the Acceleration Bay case that we provided a letter on, a jury verdict does nothing like that. A jury verdict is not voluntary, and especially not one that is legally flawed, which you have here. And this idea that the Vonage verdict was just some small thing at trial, I mean, look at opening statement, appendix 3155. Do you remember the Vonage verdict? The 5% royalty? Dr. Rowell is going to look at that. He's going to arrive at a royalty of $1.37. That's the number that we'll offer you to consider. And the last point that I want to make with respect to the Vonage verdict is this. The idea of a jury verdict being like other comparables, being like other licenses, makes no sense. A verdict comes with the imprimatur of authority. It is highly influential when you bring in a jury verdict. It invites the prior jury, excuse me, the second jury to follow it. That raises very serious due process concerns, as the Third Circuit articulated in Coleman, as this court articulated in Mendenhall. And there's a reason that these are generally not allowed, particularly a verdict that was never appealed. The parties ended up settling for a fraction. Thank you, Judge Chin. I appreciate the court's indulgence. Thank you.